# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRENTON TODD WRIGHTS, | CASE NO. 3:13-cv-02516-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | MEMORANDUM |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | Docs. 1, 8, 9, 10, 11, 14, 15 |

## <u>MEMORANDUM</u>

## I.    Procedural Background

On March 22, 2011, Brenton Todd Wrights ("Plaintiff") protectively filed an application as a claimant for Title XVI supplemental security income ("SSI") and Title II disability insurance benefits ("DIB"),[1]  with an alleged disability onset of January 31, 2009.[2]   (Administrative Transcript, hereinafter, "Tr." at 148-154).

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured," which in this case is June 30, 2012.

[2] The relevant period for Plaintiff's DIB claim begins on Plaintiff's alleged onset date of January 31, 2009, and ends on Plaintiff's date last insured for DIB, June 30, 2012 (Tr. 11, 155, 162).  *See*

After Plaintiff's claim was denied at the initial level of administrative review, at Plaintiff's request, on August 21, 2012, an administrative law judge ("ALJ") held a hearing at which Plaintiff, who was represented by an attorney, and a vocational expert ("VE") appeared and testified.  (Tr. 26-61).  On August 23, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits.  (Tr. 8-25).  On September 19, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7), which the Appeals Council denied on September 13, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-6).

On October 7, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  Doc. 1.  On January 29, 2014, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  Doc. 9, 10.  On February 25, 2014, Plaintiff filed a brief in support of the appeal ("Pl. Brief").  Doc. 10.  On March 19, 2014, Defendant filed a brief in response ("Def. Brief").  Doc. 11.  On

---

20 C.F.R. § 404.131(a).  The relevant period for Plaintiffs SSI claim begins with his March 22, 2011, application date, through the date of the ALJ's decision on August 23, 2012 (Tr. 21, 148). *See* 20 C.F.R. § 416.202; § 416.501.

April 29, 2014, the Court referred this case to the undersigned Magistrate Judge.

Both parties consented to the referral of this case to the undersigned Magistrate

Judge, and an order referring the case to the undersigned Magistrate Judge was

entered on June 4, 2014.  Doc. 13, 14.

## II. Relevant Facts in the Record[3]

Plaintiff was born January 25, 1971, and thus was classified by the

regulations as a younger person through the date of the ALJ decision on August 23,

2012.  (Tr. 20); 20 C.F.R. § 404.1563(c).  From the beginning of Plaintiff's claim,

Plaintiff alleged amputation of left leg below the knee, neck and back problems,

and hyperthyroidism as his impairments.  (Tr. 62).  In a pre-hearing brief filed to

the ALJ dated August 15, 2012, Plaintiff alleged the following impairments: 1)

Below-the-knee amputation, left leg; 2) Degenerative disc disease and disc bulges

at C5-6; C6-7; 3) Right hand trigger fingers (citing to Exhibit 8F); and 4)

Dysthymic Disorder.  (Tr. 217-18).

After completing high school, Plaintiff obtained vocational training in

heating and plumbing.  (Tr. 30).  When Plaintiff was 19 years old, he suffered a

---

[3] Given that Plaintiff's brief is arguing errors relating to physical limitations, namely hypothyroidism and trigger finger limitations, the Court will accordingly limit the summary of facts.

gunshot wound to the lower, left leg, which resulted in a below-the-knee amputation of the left leg. (Tr. 35-6); Pl. Brief at 5. After the amputation, Plaintiff experienced occasional left leg pain often associated with a worn-out or ill-fitting prosthetic lower leg and with residual shotgun pellets embedded under his skin. (Tr. 36; 240-49); Brief at 5. Plaintiff was able to work when he was wearing the prosthetic. (Tr. 37); Brief at 5.

Plaintiff's past relevant work includes working as a material expediter, Dictionary of Occupational Titles ("DICOT") code 221.367-042; a general machinist, metal parts, DICOT code 600.280-022; tires, material picker, DICOT code 921.683-050, and; a welder, DICOT code 819.384-010. (Tr. 19, 45-46, 214). Plaintiff was last employed as a welder (DICOT code 819.384-010) until he was laid off on January 31, 2009, the same day as Plaintiff's alleged onset of disability. (Tr. 177). In hearing testimony, Plaintiff described that his employer had a big layoff despite the fact that he was "a really good welder" and that he was only laid off because he worked there for less than a year and lacked seniority. (Tr. 39). Plaintiff testified that his former employer sought to rehire him immediately, but he was incarcerated at the time. (Tr. 39). Plaintiff was incarcerated from July 10, 2009 to March 7, 2011. (Tr. 269-94); Pl. Brief at 4. Upon his release from prison,

Plaintiff was homeless, and after trying various living arrangements, ultimately found a semi-permanent residence in a house previously owned by his girlfriend's grandmother who had passed away while he was incarcerated.  (Tr. 40); Pl. Brief at 4.  When Plaintiff was trimming tree branches on the property of his new home, he fell out of a tree, and injured his left leg.  (Tr. 41); Pl. Brief at 4-5.

## A. Relevant Treatment History and Medical Opinions

### 1. Balint Balog, M.D.

On March 12, 2008, Plaintiff reported experiencing tingling and numbness that extended to the right index and middle fingers and noted that Plaintiff worked as a welder.  (Tr. 331).  Plaintiff also reported a daily "triggering and locking" of his right middle and ring fingers.  (Tr. 330).  Dr. Balog referred Plaintiff for electro-diagnostic testing of his right arm, testing which demonstrated normal findings.  (Tr. 329-330).  In a follow-up record dated April 23, 2008, Dr. Balog assessed Plaintiff with trigger fingers of his right middle and ring fingers and administered an injection to his right hand.  (Tr. 330).  Dr. Balog did not schedule a follow-up appointment and indicated that Plaintiff may continue working.  (Tr. 330).

**2.  Mohammad Haq, M.D., Consultative Examination, May 26, 2011**

During the May 2011 examination, Dr. Haq observed Plaintiff to be in no acute distress, and the amputation site appeared healthy except for a couple of slight irregular bony swellings.  (Tr. 314).  Plaintiff denied any history of arthritis in the hands.  (Tr. 313).  Dr. Haq noted that Plaintiff's medications included Synthroid,[4] that his thyroid was normal, and that there was no lymphadenopathy of the neck or supraclavicular area.  (Tr. 314).  Plaintiff had no swelling, edema, or ulceration at the site of amputation; he demonstrated the ability to arise from a seated position, climb on-and-off the examination table; and demonstrated the ability to bend and lift objects off the floor without any assistance or difficulty.  (Tr. 315).  Dr. Haq assessed Plaintiff to have neck, left leg and lumbosacral pain; depression with a possibility of bipolar disorder; and, a history of hypothyroidism.  (Tr. 315-16).  In addition to indicating Plaintiff's limitations with gross motor functions, Dr. Haq indicated that Plaintiff did not have any limitation with reaching, handling, fingering, and feeling.  (Tr. 318).  Dr. Haq indicated that Plaintiff had full range of motion in his wrists.  (Tr. 319, 321).  Dr. Haq also

---

[4] Synthroid is used to treat hypothyroidism.  See *Dorland's Illustrated Medical Dictionary* 1032, 1856 (32nd ed. 2012).

indicated that Plaintiff had full range of motion of all of his fingers and had full strength in his hands.  (Tr. 322).

### 3.  Richard Richards, M.D.

On August 31, 2011, Plaintiff saw orthopedist Dr. Richards, for increased pain related to his left leg amputation.  (Tr. 339).  Plaintiff reported that the increased pain began March 2011.  (Tr. 339).  Dr. Richards noted one of Plaintiff's medications included Levothyroxine[5] and that Plaintiff's lymphatic examination was normal.  (Tr. 339).  Dr. Richards noted that Plaintiff's prosthesis was worn-out; x-rays of his left knee showed metallic debris within the knee, but no significant arthritis.  (Tr. 340).  Dr. Richards instructed Plaintiff to follow up with his primary care physician who prescribed his pain medication.  (Tr. 340). Additionally, on August 31, 2011, Plaintiff fell out of a tree that he was pruning and fractured his left mid-femur, resulting in the placement of a titanium rod.  (Tr. 40-41, 394).

### 4.  Ryan Hikes, M.D.

After Plaintiff's fall in August 2011 and related operation, Plaintiff was treated by Dr. Hikes.  (Tr. 394).  In a treatment record dated September 8, 2011,

[5] Levothyroxine is used to treat hypothyroidism.  See *Dorland's Illustrated Medical Dictionary* 1032, 1856 (32nd ed. 2012).

Dr. Hikes observed that Plaintiff's surgical wounds were healing well and that Plaintiff "was somewhat mobile with his right leg and crutches." (Tr. 394). Dr. Hikes assessed Plaintiff's left leg femur fracture as "improving but still very painful," and increased Plaintiff's OxyContin prescription. (Tr. 394). Through October and December 2011, Dr. Hikes noted that Plaintiff had been using his left leg prosthesis again and medication was adjusted to address his pain. (Tr. 397-99). In January 2012, Dr. Hikes noted that Plaintiff's symptoms were stable and his pain was controlled with medication. (Tr. 403).

### 5.  Hanger Prosthetics and Orthotics

In an assessment dated April 17, 2008, Robert Florschultz, C.P.,[6] indicated that Plaintiff's hand and finger dexterity was normal. (Tr. 245). On September 6, 2011, and October 4, 2011 Plaintiff was seen for pain management and for a new prosthesis. (Tr. 383-84). On October 18, 2011, Plaintiff reported experiencing a lot of pain, but had denied any concerns with his prosthesis, indicating that he was happy with the fit and alignment. (Tr. 385). In a treatment record dated February

---

[6] From the context of the record, it appears that the C.P. stands for "Certified Prosthetist." *See e.g.*, *Chedville v. Astrue*, No. CIV.A. 10-47, 2011 WL 445633, at *7 n.5 (M.D. La. Jan. 10, 2011) report and recommendation adopted, No. CIV.A. 10-47, 2011 WL 397904 (M.D. La. Feb. 2, 2011) ("According to the American Board for Certification in Orthotics, Prosthetics and Pedorthics, Inc., the initials 'C.P.' stand for certified prosthetist").

2, 2012, Plaintiff reported a pressure point at the site of his amputation and it was observed that he could ambulate with a cane. (Tr. 386). In a treatment record dated March 8, 2012, Plaintiff reported recent significant weight loss which caused his prosthesis to slip. (Tr. 388). After the adjustments, Plaintiff reported "feeling better" and was observed as ambulating well. (Tr. 388).

### 6. Thomas DiPasquale, D.O.

On July 25, 2012, Plaintiff requested increased pain medication for left hip pain following his fall from a tree a month prior. (Tr. 430). Dr. DiPasquale observed that Plaintiff had some left hip soreness with extreme internal rotation, but was able to perform hip abduction and flexion without difficulty. (Tr. 430). Dr. DiPasquale observed that radiographs taken July 2012 showed no acute fractures or dislocations of his left femur and no evidence of acute process of the hip. (Tr. 413-14, 430). In a letter dated July 25, 2012, Dr. DiPasquale wrote that from Plaintiff's symptoms and diagnostic imaging of the hip and leg, it was likely Plaintiff suffered soft tissue injury that would take months to return to his former state and during the healing process, may need to use two crutches for a period of time. (Tr. 428). Dr. DiPasquale explicitly deferred his opinion on all matters regarding Plaintiff's disability. (Tr. 428).

### 7.  William Milroth, M.D.

In March 2011, Plaintiff requested narcotic pain medication from Dr. Milroth.  (Tr. 300).  Dr. Milroth declined to prescribe medication, noting that Plaintiff had not used narcotic medication the previous two years while incarcerated, but he referred Plaintiff to Pain Medicine of Franklin County.  (Tr. 300).

### 8.  Summit Pain Medicine: Marcia Helfrick, CRNP; Ewa M. Malinowski M.D.

On May 9, 2011, Plaintiff underwent an initial pain management evaluation for pain in his neck and shoulders.  (Tr. 332).  Ms. Helfrick observed that Plaintiff had tenderness to palpation over his cervical spine and limited cervical range of motion, but he had normal strength, full range of motion in his shoulders, and no sensory or reflex deficits.  (Tr. 333).  Ms. Helfrick assessed Plaintiff with Bilateral trapezius muscle spasms and neck pain and recommended physical therapy and prescribed pain medication.  (Tr. 333).

### 9.  Records Relating to Hypothyroidism

In a treatment record dated May 6, 2008, Dr. Timothy J. Sempowski D.O. noted that Plaintiff's medical history included a diagnosis of hypothyroidism and

Plaintiff's current medication included Levothyroxine used to treat hypothyroidism.[7]  (Tr. 234, 339).  In a record dated May 26, 2011, Dr. Haq noted Plaintiff's history of hypothyroidism, examined plaintiff and noted "thyroid normal." (Tr. 314-15).   In a treatment record dated August 31, 2011, Dr. Richards noted that Plaintiff's medications included Levothyroxine and that Plaintiff's lymphatic examination was normal.  (Tr. 339).   In December 2011and January 2012 treatment records, Dr. Hikes observed that Plaintiff's thyroid was without masses.  (Tr. 402, 403).

### III.     Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

---

[7] See *supra* note 5.

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits.  20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428.  If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed.  20 C.F.R. § 404.1520(a)(4).  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  20 C.F.R. §§ 404.1520, 416.920.  Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Id.* The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1512(a), 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires only 'more

than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance.  *Jones*, 364 F.3d at 503.   If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## A. Step Two

Plaintiff argues that the ALJ erred by failing to address any limitations by Plaintiff's hypothyroidism, and any limitation by Plaintiff's "trigger fingers of the right middle and ring fingers."  Pl. Brief at 10-11.  Plaintiff emphasizes that:

> Consideration of impairments of the hands is particularly important in this case. The VE opined that Mr. Wrights could perform the jobs of "document preparer - DOT 249.587-018" and "envelope addresser - DOT 249.587-010" (R. 20). The Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations ("SCO") state that both of these jobs require "frequent fingering". Had the ALJ properly considered Mr. Wright's right hand limitations, the VE would have been required to testify that these jobs are unavailable in order for his testimony to be consistent with the fingering requirements contained in the DOT and the SCO.

Pl. Brief at 11.

At step two of the five-step sequential inquiry, the ALJ must determine whether the claimant has a medically severe impairment or combination of impairments. *See Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). An impairment is severe only if it significantly limits the claimant's physical or mental ability to do "basic work activities," *i.e.*, physical abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, or mental activities such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b); 416.921(b).

A "severe" impairment is distinguished from "a slight abnormality," which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of the claimant's age, education, or work experience.  *See Bowen*, 482 U.S. at 149-51.  The claimant has the burden of showing that an impairment is severe.  *Bowen*, 482 U.S. at 146 n. 5.  Moreover, objective medical diagnoses alone are insufficient to establish severity at step two; a claimant must also present evidence that these limitations significantly limited his or her ability to do basic work activities or impaired his or her capacity to cope

with the mental demands of working.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521(a), 416.921(a); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 (3d Cir. 2007).

If a claimant has any severe impairment, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g), 416.920(d)-(g).   A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two and all impairments are considered at step four when setting the residual functional capacity.  *See* 20 C.F.R. §§ 404.1523, 416.923 and 404.1545(a)(2), § 416.945(a)(2); *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005); *Shannon v. Astrue*, No. 4:11-CV-00289, 2012 WL 1205816, at *10-11 (M.D. Pa. Apr. 11, 2012); *Bell v. Colvin*, No. 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D. Pa. Dec. 23, 2013).

Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the impairment.  *See Alexander v. Shalala*, 927 F. Supp. 785, 792 (D. N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *accord*, *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006).   Where the ALJ finds that Plaintiff suffers from even one severe impairment, any failure on the ALJ's part to identify other conditions as severe or

precisely name the severe impairment does not undermine the entire analysis, when ultimately the ALJ properly characterized the symptoms and functional limitations. *See e.g.*, *Lambert v. Astrue*, No. Civ. A. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009); *Alexander v. Shalala*, 927 F. Supp. 785, 792 (D. N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *Faircloth v. Colvin*, No. Civ.A.12–1824, 2013 WL 3354546, at *11 (W.D.Pa.2013), *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n. 2 (3d Cir. 2007); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("any error here became harmless when the ALJ reached the proper conclusion that [Plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step"); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("[T]he ALJ considered any limitations posed by the [impairment] at Step 4 . . . any error that the ALJ made in failing to include the [impairment] at Step 2 was harmless").

### 1. Hypothyroidism

The Court finds that Plaintiff failed to meet his burden to demonstrate that hypothyroidism is a severe impairment. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). As mentioned above, objective medical diagnoses alone are insufficient to establish severity at step two; a claimant must also present evidence

that these limitations significantly limited his or her ability to do basic work activities or impaired his or her capacity to cope with the mental demands of working. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521(a), 416.921(a); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 (3d Cir. 2007).

The records indicate that Plaintiff's hypothyroidism is controlled by medication and the records do not indicate any signs, symptoms, or limitations imposed from the diagnosed condition. In a treatment record dated May 6, 2008, Dr. Sempowski noted that Plaintiff's medical history included a diagnosis of hypothyroidism and Plaintiff's was prescribed Levothyroxine to treat hypothyroidism. (Tr. 234, 339). During the May 2011 examination, Dr. Haq noted that Plaintiff's medications included Synthroid, that his thyroid was normal, and that there was no lymphadenopathy of the neck or supraclavicular area. (Tr. 314). Dr. Haq assessed Plaintiff to have a "history" of hypothyroidism. (Tr. 315-16). In a treatment record dated August 31, 2011, Dr. Richards noted that Plaintiff's medications included Levothyroxine and that Plaintiff's lymphatic examination was normal. (Tr. 339). In December 2011 and January 2012 treatment records, Dr. Hikes observed that Plaintiff's thyroid was without masses. (Tr. 402, 403).

The medical record does not support a finding that Plaintiff's hypothyroidism is a severe impairment. *See* 20 C.F.R. §§ 404.1521(b); 416.921(b), *Bowen*, 482 U.S. at 149-51. Any error by the ALJ in omitting hypothyroidism as a severe impairment is harmless. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005); *see also Bowser v. Comm'r of Soc. Sec.*, 121 F. App'x 231, 237 (9th Cir. 2005) (unpublished decision).[8]

## 2. Trigger Finger in Right Hand

The Court also finds that any error of the ALJ in omitting any mention of Plaintiff's trigger fingers is harmless. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Plaintiff did not allege in his application or testify at hearing that he was disabled by any impairment of the fingers. Rather, in a pre-hearing brief filed to the ALJ dated August 15, 2012, Plaintiff alleged for the first time that "Trigger fingers of right and middle fingers" created a severe impairment. (Tr. 217). Although Plaintiff placed the ALJ on notice such that the ALJ should have

---

[8] The Court notes that under facts similar to those in the instant matter, the Ninth Circuit found harmless error. *See Bowser v. Comm'r of Soc. Sec.*, 121 F. App'x 231, 237 (9th Cir. 2005). In *Bowser v. Comm'r of Soc. Sec.*, the Ninth Circuit where although ALJ failed to address the impact of a plaintiff's hypothyroidism, the plaintiff had not alleged that the hypothyroidism caused any symptoms or limitations on her ability to work, the medical record revealed that her prescribed medication successfully controlled the condition, and the record consistently noted no enlargement of the thyroid gland. *Bowser v. Comm'r of Soc. Sec.*, 121 F. App'x 231, 237 (9th Cir. 2005).

addressed the trigger fingers in the decision,[9] Plaintiff still failed to meet his burden to demonstrate that the trigger fingers of the left hand resulted in limitations which impaired Plaintiff's ability to work.  *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993); *see also Kitts v. Apfel*, 204 F.3d 785, 786 (8th Cir. 2000) (finding that where the plaintiff failed to allege a mental impairment in her application or at the hearing, and the record showed only a diagnosis and medication the ALJ was not on notice).

The evidence shows that Plaintiff reported symptoms and received treatment nearly a year prior to the alleged onset date.  (Tr. 177, 329-331). Moreover, at the time Plaintiff reported trigger finger symptoms, he was successfully working as a welder, a job which requires finger dexterity, and his treating physician stated that Plaintiff could continue doing his job.  (Tr. 39, 331). Additionally, Plaintiff testified that he was really good at his job as a welder, only lost his job in January 2009 due to lack of seniority during a layoff, and was immediately asked to return, however, could not return due to his incarceration at the time.  (Tr. 39).  Finally, medical records indicate that Plaintiff had a full range

---

[9] The Court also notes that such a delay does not give the agency  notice for the purpose of development and ensuring  agency medical evaluations and consultations address the alleged impairment.

of motion in all of his fingers and Plaintiff did not complain about his hands when specifically asked if he had any history of arthritis in his hands.  (Tr. 245, 313, 318-19, 321)

The only records of Plaintiff reporting trigger finger symptoms or receiving treatment relating to such symptoms was in 2008, nearly a year before his alleged January 2009 onset.  On March 12, 2008, Plaintiff reported experiencing tingling and numbness that extended to the right index and middle fingers and noted that Plaintiff worked as a welder.  (Tr. 331).  Plaintiff also reported a daily "triggering and locking" of his right middle and ring fingers.  (Tr. 330).  Dr. Balog referred Plaintiff for electro-diagnostic testing of his right arm, which was normal.  (Tr. 329-330).  In a follow-up record dated April 23, 2008, Dr. Balog assessed Plaintiff with trigger fingers of his right middle and ring fingers and administered an injection to his right hand.  (Tr. 330).  Dr. Balog did not schedule a follow up appointment and indicated that Plaintiff may continue working.  (Tr. 330).

Additional records show that Plaintiff did not exhibit any limitations in his fingers or hands.  In an assessment dated April 17, 2008, Mr. Florschultz indicated that Plaintiff's hand and finger dexterity was normal.  (Tr. 245).  During the May 2011 examination with Dr. Haq, Plaintiff denied any history of arthritis in the

hands.  (Tr. 313).  In addition to indicating Plaintiff's limitations with gross motor functions, Dr. Haq indicated that Plaintiff did not have any limitation with reaching, handling, fingering, and feeling.  (Tr. 318).  Dr. Haq indicated that Plaintiff had full range of motion in his wrists.  (Tr. 319, 321).  Dr. Haq also indicated that Plaintiff had full range of motion of all of his fingers and had full strength in his hands.  (Tr. 322).  In hearing testimony, Plaintiff described that his employer had a big layoff despite the fact that he was "a really good welder" and that he was only laid off because he had lacked seniority.  (Tr. 39).  Plaintiff testified that when his former employer started rehiring, his former employer sought to rehire him immediately, but he was incarcerated at the time.  (Tr. 39).

While Plaintiff was diagnosed and treated for trigger fingers of the right hand, he was a "really good welder," a job encompassed by DICOT code 819.384-010, which entails "Finger Dexterity: Level 3 - Middle 1/3 of the Population" and:

> Handling: Frequently - Exists from 1/3 to 2/3 of the time
> Fingering: Frequently - Exists from 1/3 to 2/3 of the time
> Feeling: Not Present – Activity or condition does not exist

DICOT 379.367-010.  From the VE testimony, the ALJ determined that Plaintiff was capable of working as an envelope addresser, DICOT code 209.587-010,

which entails "Finger Dexterity: Level 4 - Lowest 1/3 Excluding Bottom 10 [percent]" and:

> Handling: Frequently - Exists from 1/3 to 2/3 of the time
> Fingering: Frequently - Exists from 1/3 to 2/3 of the time
> Feeling: Not Present - Activity or condition does not exist

DICOT code 209.587-010. Also from the VE testimony, the ALJ determined that Plaintiff was capable of working as an a document preparer, DICOT code 249.587-018, which entails "Finger Dexterity: Level 4 - Lowest 1/3 Excluding Bottom 10 [percent]" and:

> Handling: Frequently - Exists from 1/3 to 2/3 of the time
> Fingering: Frequently - Exists from 1/3 to 2/3 of the time
> Feeling: Not Present - Activity or condition does not exist

DICOT code 209.587-010. Given that the jobs that the ALJ determined Plaintiff was still capable of doing, require no more finger or hand ability than what Plaintiff possessed at the time of his diagnosis and treatment of trigger fingers of the right hand, the Court finds that Plaintiff did not meet his burden and the medical record does demonstrate that these limitations significantly limited his ability to do basic work activities. *See Bowen*, 482 U.S. at 146 n. 5; *See* 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521(a), 416.921(a), 404.1512(a), 416.912(a); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 (3d Cir. 2007);

*Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Court finds that any error by the ALJ failing to address Plaintiff's trigger fingers is harmless and remand is not warranted.

## B. Weight Accorded to Opinions

Plaintiff argues that "the ALJ committed an error of law when he failed to consider the medical opinions of [Drs. DiPasquale and Balog]."  Pl. Brief at 12. Defendant argues that "[t]reatment notes are not 'medical opinions' under the regulations."  Def. Brief at 17.  Defendants argue that to qualify as an "opinion" a physician statement needs to reflect an assessment in a:

> . . . special manner articulated in the regulations precisely because they are likely to provide a "longitudinal picture" of the claimant's medical impairment and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."

Def. Brief at 17-18 (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)).

In the August 2012 decision, the ALJ wrote:

In July 2012, [Dr. DiPasquale] examined the claimant, noting that he has increased left hip pain following a fall. Dr. DiPisquale [sic] noted that the claimant has some soreness with extreme internal rotation. However, Dr. DiPasquale also noted that the claimant is able to flex his left hip and perform hip abduction without difficulty. Further, a CT scan was taken of the claimant's left hip, revealing normal results.

> Dr. DiPasquale advised the claimant to begin using non-steroidal anti-inflammatory medication.

(Tr. 16) (internal citations to the record omitted).   The Court observes that "[m]edical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions."   20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).   "An ALJ however, need not proscribe weight to a general statement by a treating or consulting physician."   *Clark v. Colvin*, No. CV 12-1116-RGA-MPT, 2013 WL 3834046, at *10-11 (D. Del. July 24, 2013) *report and recommendation adopted sub nom. Clark v. Astrue*, No. CV 12-1116-RGA, 2013 WL 4407880 (D. Del. Aug. 15, 2013).   While "symptoms, diagnosis and prognosis" fall within the definition of "medical opinion," more probative opinions are those that "that reflect judgments about the nature and severity of [a claimant's] impairment(s)" and particularly describe what a claimant can or cannot do in a typical work setting.   *See e.g.*, *Clark v. Colvin*, No. CV 12-1116-RGA-MPT, 2013 WL 3834046, at *10-11 (D. Del. July 24, 2013); *John v. Colvin*, No. CIV.A. 12-

1292, 2013 WL 3369118, at *8 (W.D. Pa. July 2, 2013) *Fry v. Astrue*, No. 3:09CV747, 2010 WL 2891493, at *7 (W.D. Pa. July 21, 2010).

Within the broad definition of section 404.1527(a)(2) and 416.927(a)(2), the treatment records from Drs. DiPasquale and Balog are medical opinions in that they reflect symptoms and diagnoses. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). As discussed above, the ALJ's omission of Dr. Balog's diagnosis of trigger fingers is harmless error. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).

As for Dr. DiPasquale's opinion, the Court finds that the ALJ's failure to specifically state what weight to give the opinion is harmless, given that the ALJ obviously addressed the treatment records and opinion of Dr. DiPasquale, the opinion is not probative regarding the issue of what Plaintiff can or cannot do in a typical work setting, and the opinion does not conflict with Plaintiff's residual functional capacity. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (articulating harmless error standard); *Gilliland v. Heckler*, 786 F.2d 178, 183-84 (3d Cir. 1986) (requiring addressing opinions that conflict with RFC with an "analytical comment or record reference"); *Clark v. Colvin*, No. CV 12-1116-RGA-MPT, 2013 WL 3834046, at *10-11 (D. Del. July 24, 2013); *Robinson v.*

*Astrue*, 365 F. App'x 993, 995-96 (11th Cir. 2010) (finding that plaintiff failed to show prejudice resulting from any failure by the ALJ to make specific findings regarding a diagnosis in the records).  Moreover, as the Third Circuit has observed, a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013).  The ALJ provided enough analysis to demonstrate that Dr. DiPasquale's opinion was accounted for and the opinion does not conflict with the ALJ's determination of Plaintiff's RFC. Based on the foregoing, the Court finds that remand is not warranted in this instance.

### IV. Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence.  42 U.S.C. §§ 405(g), 1382c; *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of

evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.


Dated: May 14, 2015                              s/Gerald B. Cohn
                                         _____
                                         GERALD B. COHN
                                         UNITED STATES MAGISTRATE JUDGE